**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

KAMCO INDUSTRIAL SALES, INC.,
                    Plaintiff,

        v.                                      Civil Action No. 09-1407

LOVEJOY, INC.,
                                Defendant.

## OPINION

On April 1, 2009, Kamco Industrial Sales, Inc. ("Kamco"), the plaintiff in this

diversity action, filed a complaint alleging that defendant Lovejoy, Inc. ("Lovejoy")

committed breach of contract and violated the Pennsylvania Commissioned Sales

Representative Act, 43 Pa. Cons. Stat. § 1471 *et seq.* ("PCSRA").  After the close of

discovery, Lovejoy filed a motion for summary judgment.  For the reasons presented

below, Lovejoy's summary judgment motion will be granted in part and denied in part.

## I.  BACKGROUND

In 1988, Kendall Morrison founded plaintiff Kamco, which is a Pennsylvania

corporation with its principal place of business in Valley Forge, Pennsylvania.  Kamco

serves as a commissioned sales representative, marketing products for use in the power

transmission industry.  Lovejoy, which is an Illinois corporation with its principal place of

business in Downers Grove, Illinois, is a manufacturer and distributor of couplings and other power transmission component parts. On December 18, 2003, the parties entered into the Lovejoy, Inc.-Kamco Industrial Products, Inc. Sales Representative Agreement (the "Agreement"), through which Kamco became a commissioned sales representative for Lovejoy.

Under the terms of the Agreement, Lovejoy authorized Kamco to sell Lovejoy's products in Maryland, Delaware, the District of Columbia, and portions of Pennsylvania and New Jersey (the "Territory"). *See* Agreement ¶ 6.[1] The Agreement also provided that, as long as the Agreement remained in force, Kamco would receive commissions for "all orders accepted by [Lovejoy] from their territory," apart from orders falling onto one or another of several expressly excepted categories. *Id.* ¶ 7. The exception at the center of the present lawsuit concerned so-called "House Accounts," or accounts which would be handled directly by Lovejoy's in-house sales employees. With respect to such accounts, the Agreement provided:

> c) No commissions will be paid on House Account sales. The Company reserves the right to redefine these accounts. Addendum A attached shows a current roster of the aforementioned accounts in your territory.

*Id.* ¶ 7(c) (hereinafter "House Account provision").[2] At the time the parties entered into

---

[1] The Agreement was attached to Kamco's complaint as Exhibit A.

[2] In its entirety, Paragraph 7 provides that:

This territory is exclusive, with the following exceptions:
    a) No commissions will be paid on export sales.

the Agreement, Addendum A listed six House Accounts.  *Id.*, Add'm A.

The Agreement also contained other provisions relevant to the present dispute. First, it contained a noncompetition provision which stated that Kamco could not "offer, promote or sell any product which is directly competitive with any product [Kamco] is to offer, promote or sell" for Lovejoy without Lovejoy's written consent.  *Id.* ¶ 2.  Second, it provided that during the first six months of the Agreement Kamco would be entitled to a three percent (3%) commission on sales to pre-existing customers, and an eight percent (8%) commission on all "new business" generated by Kamco.  *Id.* ¶¶ 9-10.  After the first six months, the commission rate for all business would be five percent (5%), irrespective of whether the business was classified as new or pre-existing.  *Id.* ¶ 11.  Third, with respect to termination, the Agreement provided that it would last for one year and would be automatically renewed for one-year periods thereafter unless terminated in writing by

---

> b) No commissions will be paid on Government contracts or on sales to those accounts classified as Government Accounts (Company Sales Territory 39).
> c) No commissions will be paid on House Account sales.  The Company reserves the right to redefine these accounts.  Addendum A attached shows a current roster of the aforementioned accounts in your territory.
> d) No commissions will be paid on labor charges or freight charges.
>
> The Representative [*i.e.*, Kamco] shall be credited with all orders accepted by the Company [*i.e.*, Lovejoy] from their territory, except as noted above, as long as this Agreement remains in force.

Agreement ¶ 7.

either party 60 days before the start of a new one-year term.  *Id.* ¶ 16.

Pursuant to the Agreement, Kamco began operating as a commissioned manufacturer's sales representative for Lovejoy on January 1, 2004.  Kamco marketed couplings and a variety of other products manufactured and sold by Lovejoy for use in the power transmission industry.  The parties operated under the Agreement for several years without any serious disputes arising.  During that period, Kamco also served as an independent sales agent for at least eight different manufacturers other than Lovejoy.  *See* Def.'s Ex. D,  Pl.'s Resp. to Lovejoy's Interrog. No. 2, at 2.[3]

Prior to 2009, defendant Lovejoy made changes to the list of House Accounts on three occasions.  First, in May 2006, defendant Lovejoy decided to remove a customer named Ingersoll-Rand from the House Account list and redefine it as a Kamco account.  Lovejoy's Director of Sales Douglas Durham explained in his deposition that Kamco's owner Ken Morrison:

> had other products that he was selling into that account.  We had had a sales—a direct salesperson change at that point in time . . . and it just seemed logical that Ken would use his relationship there to continue his business.

*See* Pl.'s Ex. 3, Durham Dep. at 21:10-19; *see also* Pl.'s Ex. 5, Letter from Mike

---

[3] Throughout this opinion, all references to "Def.'s Ex." refer to exhibits attached to the defendant's memorandum in support of its motion for summary judgment, *see* Dkt. 31, and all references to "Pl.'s Ex." refer to exhibits attached to plaintiff's response to defendant's motion for summary judgment.  *See* Dkt. 32.  Similarly, the defendant's summary judgment brief shall be referred to as "Def.'s Br.," *see* Dkt. 31, the plaintiff's brief opposing summary judgment as "Pl.'s Opp. Br., " *see* Dkt. 32, and the defendant's reply as "Def.'s Reply Br.," *see* Dkt. 38.

Power, Lovejoy, to Ken Morrison, Kamco, May 17, 2006 (providing that Kamco would have account responsibility for Ingersoll-Rand effective May 1, 2006). Second, in October 2008, Ingersoll-Rand was redefined as a House Account after another company purchased it. *See* Pl.'s Ex. 1, Morrison Dep. at 137:17-139:2. On the third occasion, in March 2007, Lovejoy redefined another of the House Accounts, Bosch Rexroth Corp., such that Kamco would receive commissions on sales of products known as "covers" but not on the sales of "housings." *See id.* at 90:6-92:17; Pl.'s Ex. 6, Letter from Mike Power, Lovejoy, to Ken Morrison, Kamco, March 12, 2007.

The dispute that gave rise to this lawsuit emerged in January 2009. In the months before then, Lovejoy, like many American businesses, experienced falling revenues due to the economic downturn. In response, Lovejoy began taking measures to reduce its costs. For example, David Mortensen, Lovejoy's Vice President of Sales and Marketing, negotiated commission reductions with two other outside sales agents. *See* Def.'s Ex. A, Mortensen Dep. at 70:21-71:3. Lovejoy also contemplated terminating its Agreement with Kamco. *See* Pl.'s Ex. 7, Email from Douglas Durham, Lovejoy, to David Mortensen, Lovejoy, Oct. 8, 2008 (suggesting that Lovejoy "could also look at cancelling Kamco"). However, Lovejoy elected not to terminate the Agreement and instead allowed it to automatically renew for an additional year on January 1, 2009.

On January 8, 2009, Mortensen, of Lovejoy, called Morrison, of Kamco, to discuss the parties' Agreement. During the course of the conversation, Mortensen acknowledged that, under the Agreement's termination provision, the Agreement could not be terminated until the end of the year. However, he explained that Lovejoy wanted to terminate the Agreement to save money and offered to pay Kamco commissions for three months in exchange for the termination of the agreement. At his deposition, Mortensen testified as follows regarding the conversation:

Q    And what did you say to [Morrison]?

A    Well, what I said was that per the contract that we couldn't terminate the contract except in, I think it was, October of every year—it was renewable if we didn't let him know 60 days before—but there was a clause in the contract that if we mutually agreed, we could either terminate the contract or change the contract and that my goal was to try and talk to Ken about getting cost savings in his territory, that we were doing this across the board. He would be a small part of the total cost savings we were looking for, but that we needed to see what we could do.

Q    And what did you suggest that he do?

A    Well, he said, "I have a contract," and repeated that five or six times. And in the first conversation I said, "Ken, I know this has hit you as a surprise. Why don't you go back and look at the contract, and let's talk again in a couple of days."

* * * *

Q    Did you ever suggest to him that you would agree to pay him commissions through March of 2009 if he voluntarily agreed to give up the contract?

6

> A     Well, that was—that was an offer that I had approval to present to him from the owner, so I did tell him that.
>
> Q     Did you make that offer?
>
> A     Yes, I did.

*See* Pl.'s Ex. 4, Mortensen Dep. at 7:6-8:4; 10:3-11.  In his deposition, Morrison likewise testified that Lovejoy proposed to pay Kamco commissions through the end of March 2009 and then to terminate the contract.  Pl.'s Ex. 1, Morrison Dep. 116:14-117:3.

During a follow-up conversation, Mortensen informed Morrison that, if Kamco and Lovejoy couldn't agree to terminate the contract, Lovejoy would explore other ways to save costs in Kamco's territory, including through redefinition of commissioned accounts as House Accounts.  As Mortensen testified in his deposition:

> My goal was to get cost savings out of [Morrison's] territory, not necessarily to terminate the contract, but that was one way we could.  Another way to do that would be to move many of the accounts to be house accounts where we didn't pay him commission on it [sic].  And through the discussions, I said if we can't reach a mutual agreement to terminate the contract, then we need to get cost savings, and this is one way that we believe legally in the contract we can do that.

*See* Def.'s Ex. A, Mortensen Dep. at 14:10-22.  Morrison similarly testified that Mortenson told him during the follow-up conversation that Lovejoy had "the right to make all the accounts in [Kamco's] territory house accounts."  Pl.'s Ex. 1, Morrison Dep. at 117:23-118:1; *see also* Pl.'s Ex. 12, Letter from Ken Morrison, Kamco, to David Mortensen, Lovejoy, March 6, 2009 ("On January 8, 2009, you told me that unless I accepted immediate termination of my contract with Lovejoy with payment of

commission only through March 2009, Lovejoy would convert all of my customers to house accounts.").

Morrison ultimately told Mortensen that he would not agree to the proposed termination of the Agreement at the end of March 2009. Mortensen then began planning to follow through on his suggestion that he would redefine commissioned accounts as House Accounts. On January 15, 2009, Mortensen wrote to Lovejoy's Chief Financial Officer proposing that Lovejoy "send [Kamco] a new Addendum [A] with many more accounts on it that basically includes *all* Kamco's current accounts . . . ." Pl.'s Ex. 9, Email from David Mortensen, Lovejoy, to Woody Haddix, Lovejoy, January 15, 2009 (emphasis added). The following day Mortensen wrote to another Lovejoy employee, asking her to develop a list of all of Kamco's accounts:

> I need to send Kamco a letter by the end of the month changing Addendum A to their contract that shows house accounts and listing all the accounts in their territory. I guess we should do it with both the account number and the account name. *The goal is to transfer all of them to house accounts* on 1/31/09. We will pay them normally through January, but for sales after Jan[uary] 31, *the*[*re*] *will be no more commissions because all the accounts will be house accounts*.

Pl.'s Ex. 10, Email from David Mortensen, Lovejoy, to Yesenia Mojica, Lovejoy, January 16, 2009 (emphases added).

Three days later, on January 19, 2009, Mortensen sent Kamco a letter which said the following:

> Per paragraph 7.c) of our contract dated December 18, 2003, attached is a redefined Addendum A showing the new house accounts in your territory

8

effective February 1, 2009.  This will leave the following accounts in your territory that you will be responsible for:

| Account # | Account Name |
|-----------|--------------|
| 27237001 | Bartlett Bearing |
| 8751001 | FL Smidth Minerals |
| 15069001 | Magnatech International Inc. |

Pl.'s Ex. 11, Letter from Mortensen to Morrison, January 19, 2009.  The new Addendum A attached to the letter included 125 House Accounts, including the original six House Accounts. When asked at his deposition how the accounts on the new Addendum A were selected, Douglas Durham, Lovejoy's Director of Sales, stated that "[a]ll of these accounts are the total accounts that Lovejoy has on record for doing business within Kamco's territory."  Pl.'s Ex. 3, Durham Dep. at 37:20-22.

On March 6, 2009, Morrison wrote to Mortensen a letter which stated, in relevant part:

> On January 19, 2009 you sent me a two page list adding almost every account in my territory, except for three as house accounts.  The accounts that you removed represented about 90% of our sales of Lovejoy products in 2008.  Of the three accounts that you left me, one is in financial difficulty and one is uninterested in and willing to use Lovejoy's products.

> Your action in removing almost my entire customer base from our contract acted as your termination of our contract effective January 19, 2009.

Pl.'s Ex. 12, Letter from Morrison to Mortensen, March 6, 2009.  The letter further stated that Kamco "expect[ed] to be paid commissions on all sales placed in our territory" until December 2009.  *Id.*

A few weeks later, on April 1, 2009, Kamco filed its complaint in the present

action.  *See* Dkt. 1.  The complaint contains two counts.  The first count alleges that

Lovejoy's redefinition of substantially all of the accounts previously handled by Kamco

as "House Accounts" breached the contract's implied covenant of good faith and fair

dealing.  The first count also alleges that Lovejoy's removal of substantially all of

Kamco's territory constituted constructive termination of the Agreement, in violation of

the Agreement's termination provisions.  The second count alleges that Lovejoy violated

the Pennsylvania Commissioned Sales Representative Act, 43 Pa. Cons. Stat. § 1471 *et*

*seq.* ("PCSRA" or "Act") by willfully failing to pay commissions that Kamco would have

been paid had Lovejoy not redefined the House Accounts.  Kamco seeks approximately

$45,000 in damages for unpaid commissions.  It also seeks exemplary damages and

attorneys fees under the PCSRA.

Following the filing of the complaint, and for the remainder of 2009, Kamco

continued to service the three remaining non–House Accounts and to abide by the

Agreement's non-compete provision.  Pl.'s Ex. 1, Morrison Dep. at 6:2-14; Pl.'s Ex. 4,

Mortensen Dep. at 26:21-24.  Moreover, from February until December 2009 Lovejoy

paid Kamco commissions for the three accounts.  Def.'s Ex. C., Morrison Dep. at 142:15-

143:12.  On October 7, 2009, Lovejoy sent a letter to Kamco informing Kamco that it was

providing 60 days notice of termination and that the Agreement would therefore terminate

on December 31, 2009.  On November 2, 2009, counsel for Kamco wrote to counsel for

Lovejoy an email that stated, in relevant part:

My client received your client's letter purporting to terminate the contract dated October 7, 2009. I had previously advised you that in our view, the contract was constructively terminated when your client removed almost all of its customers or potential customers from his territory. I had written to you advising you of that fact and requesting your client agree that my client could take on a competing line in order to mitigate damages. Your client continued to send my client money despite my client's ceasing to represent your client this [sic] money could not be refused since it also acted in mitigation of damages. . . .

I reiterate my client's previous request that your client now agree that the non-competition provision is no longer in effect, that the contract is ended as of the date of that letter and your client then may cease monthly payments to my client of the small sums being sent. At that point, my client will use its best efforts to obtain a competing line to attempt to mitigate your client's damages.

Pl.'s Ex. 14, Email from Mitchell Kramer to Carlin Metzger, November 2, 2009. Kamco claims that it never received a response to the request it made in this letter. Pl.'s Resp. to Def.'s Mot. for Summ. Judg. at 12.

Following discovery, defendant Lovejoy filed the motion for summary judgment presently before the court. In its motion, Lovejoy argues that Kamco has waived all of its claims in this suit by (a) continuing to accept payment for the three accounts and (b) continuing to abide by the non-compete agreement even after Kamco asserted that Lovejoy had constructively terminated the agreement. Lovejoy also argues that Kamco is not entitled to recover on its claim for breach of the implied covenant of good faith and fair dealing. Finally, Lovejoy argues that Kamco's claim does not fall within the coverage of the PCSRA.

## II. DISCUSSION

### A. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, a court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material when "its resolution 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Justofin v. Metro. Life Ins. Co.,* 372 F.3d 517, 521 (3d Cir. 2004) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

In analyzing the evidence, the court "should draw all reasonable inferences against the moving party." *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007) (citations omitted). However, the non-moving party must "adduce more than a mere scintilla of evidence in its favor," *Anderson*, 477 U.S. at 249 (citations omitted), and cannot "simply reassert factually unsupported allegations contained in its pleadings." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

**B. Waiver**

Under Pennsylvania law,[4] "[w]aiver is the voluntary and intentional abandonment or relinquishment of a known right." *Prime Medica Assocs. v. Valley Forge Ins. Co.*, 970 A.2d 1149, 1156 (Pa. Super. Ct. 2009). "'To constitute a waiver of legal right, there must be a clear, unequivocal and decisive act of the party with knowledge of such right and an evident purpose to surrender it.'" *Commonwealth ex rel. Corbett v. Griffin*, 946 A.2d 668, 679 (Pa. 2008) (quoting *Brown v. City of Pittsburgh*, 186 A.2d 399, 401 (Pa. 1962)); *see also Prime Medica Assocs.*, 970 A.2d at 1157 ("'Waiver may be established by a party's express declaration or by a party's undisputed acts or language so inconsistent with a purpose to stand on the contract provisions as to leave no opportunity for a reasonable inference to the contrary.'" (quoting *Samuel J. Marranca Gen. Contracting Co. v. Amerimar Cherry Hill Assocs. Ltd. P'ship*, 610 A.2d 499, 501 (Pa. Super. Ct. 1992))).

Lovejoy argues that Kamco's waiver of its claims in this action may be inferred from Kamco's conduct. As noted above, Kamco continued to service the three remaining non-House Accounts and to abide by the non-compete provision even after informing Lovejoy in March 2009 that Kamco believed the Agreement had been constructively terminated and after filing this lawsuit in April 2009.

---

[4] There is no dispute between the parties that Pennsylvania law applies in this diversity action.

The main difficulty with Lovejoy's waiver argument is that Kamco has consistently made express statements and taken actions demonstrating its intent *not* to waive its claims. *See* 13 Williston on Contracts § 39:22 (4th ed. 2010) ("Waiver by implication, or waiver inferred from a party's conduct, will not be found contrary to the expressed intention of the party whose rights would be injuriously affected by it, unless the other party has been misled by such conduct to his or her prejudice.").[5] Kamco filed this lawsuit within weeks after informing Lovejoy that Kamco believed that Lovejoy had breached their contract—an obvious signal that Kamco had no intention of abandoning its claims. Since filing, Kamco has been diligent in prosecuting this action. In addition, Kamco has consistently taken the position, both in its counsel's November 2, 2009 email to Lovejoy's counsel, *see* Pl.'s Ex. 14, and in its summary judgment brief, that Kamco serviced the three accounts, accepted payment for them, and abided by the non-compete agreement only in order to mitigate damages.[6]

---

[5] Lovejoy has not argued that it was misled by Kamco's conduct, nor could it in light of (1) Kamco's consistently held position that Lovejoy breached the agreement and (2) Kamco's diligent prosecution of this suit.

[6] Lovejoy suggests that Kamco's claim that it was motivated by a desire to mitigate damages is a "*non sequitor*" because "that duty merely requires a non-breaching party to take reasonable steps to avoid a loss–usually by attempting to arrange for a different transaction." Def.'s Reply Br. at 9. Lovejoy's argument fails to recognize that under Pennsylvania law waiver is essentially a matter of intent. *See Prime Medica Assocs.*, 970 A.2d at 1156 ("Waiver is the voluntary and intentional abandonment or relinquishment of a known right.").

Under these circumstances, the "reasonable inference" to be drawn from Kamco's conduct and statements is that Kamco sought to simultaneously pursue this suit and to mitigate damages—not that Kamco intended to waive its claims in this action. *Prime Medica Assocs.*, 970 A.2d at 1157. Accordingly, this court finds that Kamco's conduct, when viewed in light of its statements, is not so "clear, unequivocal and decisive" as to evince an "evident purpose" to waive its claims in this action. *Commonwealth ex rel. Corbett*, 946 A.2d at 679.

## C. Breach of Contract

Federal courts exercising diversity jurisdiction must apply state law as it has been interpreted by the state's highest court. *Borman v. Reymark Indus., Inc.*, 960 F.2d 327, 331 (3d Cir. 1992). If the state's highest court "has not addressed the issue, the federal court must predict its holding." *Id.* In making predictions, the decisions of state intermediate appellate courts are not dispositive, but should be accorded significant weight in the absence of an indication that the highest state court would rule otherwise. *See Rolick v. Collins Pine Co.*, 925 F.2d 661, 664 (3d Cir. 1991); *see also Coppola v. JNESO Pocono Med. Ctr.*, 2010 WL 4386728, at *1 (3d Cir. 2010).

Kamco's complaint asserts that Lovejoy breached the Agreement's implied covenant of good faith and fair dealing by classifying all but three of the accounts Kamco had previously serviced as House Accounts. In *Ash v. Continental Ins. Co.*, the Pennsylvania Supreme Court noted in a footnote that there exists "considerable

disagreement over the applicability of the implied duty of good faith." 932 A.2d 877, 884 n.2 (Pa. 2007). The *Ash* Court noted that Section 205 of the Restatement (Second) of Contracts states that "[e]very contract imposes on each party a duty of good faith and fair dealing in its performance and its enforcement," and that several Pennsylvania Superior courts have held that Pennsylvania has adopted Section 205. *Id.* (citing *Herzog v. Herzog*, 887 A.2d 313, 317 (Pa. Super. Ct. 2005); *Conomos, Inc. v. Sun Co., Inc.*, 831 A.2d 696, 705-06 (Pa. Super. Ct. 2003)). However, the Court also noted that several older decisions "have indicated the covenant of good faith and fair dealing is recognized only in limited situations." *Id.* (citing *Creeger Brick & Building Supply Inc. v. Mid-State Bank and Trust Company*, 560 A.2d 151 (Pa. Super. Ct. 1989) (noting that limited duty of good faith has been recognized in cases involving franchisor-franchisee relationships, insurer-insured relationships, and employer-employee relationships); *Agrecycle, Inc. v. City of Pittsburgh*, 783 A.2d 863 (Pa. Cmwlth. 2001); *Department of Transportation v. E-Z Parks, Inc.*, 620 A.2d 712 (Pa. Cmwlth. 1993)). The *Ash* Court suggested that one court had "reconciled the conflicting case law [by] determining, '[u]nder Pennsylvania Law, a covenant of good faith and fair dealing is implied in every contract. However, it does not create a cause of action in every case.'" *Id.* (quoting *Fraser v. Nationwide Mut. Ins. Co.*, 135 F. Supp. 2d 623, 643 (E.D. Pa. 2001)). Ultimately, however, the Court declined to resolve the "apparent conflict over the applicability of the implied duty of good faith" because the issue had not been presented in *Ash*. *Id.*

Subsequent to *Ash*, several diversity courts have predicted that the Pennsylvania Supreme Court would adopt Section 205 of the Restatement. *See Zaloga v. Provident Life & Accident Ins. Co. of America*, 671 F. Supp. 2d 623, 629-30 (M.D. Pa. 2009); *Western Sur. Co. v. WGG, Inc.*, 2009 WL 222429, *3 (M.D. Pa. 2009); *Fitzpatrick v. State Farm Ins. Co.*, 2010 WL 2103954, *3 (W.D. Pa. 2010); *but see Leder v. Shinfeld*, 609 F. Supp. 2d 386, 400 (E.D. Pa. 2009). This court agrees that the Pennsylvania Supreme Court would adopt Section 205 of the Restatement if squarely confronted with the question. The evidence supporting this prediction was well-summarized by the *Zaloga* court, which noted that:

> In *Atlantic Richfield Co. v. Razumic*, 480 Pa. 366, 390 A.2d 736 n. 7a (1978), the Supreme Court considered the draft form of § 205 and applied the standard of good faith and fair dealing to a franchise agreement. Further, two individual justices have also evinced their belief that Pennsylvania has adopted § 205. *See Bethlehem Steel Corp. v. Litton Indus., Inc.*, 488 A.2d 581, 600 (Pa. 1985), (Zappala, J., opinion in support of reversal); *Frickert v. Deiter Bros. Fuel Co.*, 347 A.2d 701, 705 (Pa. 1975) (Pomeroy, J., concurring). More recently, in *Murphy v. Duquesne University of the Holy Ghost*, 777 A.2d 418 (2001), the court noted a contracting party's obligation to perform with good faith: "All of the participants in the process, including [party], were required to follow the Contract's process to the letter, and fulfill their contractual obligations with good faith." *Id.* at 434 n.11.

671 F. Supp. 2d at 630 (alteration in original). In addition, this court finds that the recent trend of adoption of Section 205 in the Pennsylvania intermediate appellate courts constitutes strong corroboratory evidence that the Pennsylvania Supreme Court would adopt Section 205. *See Stamerro v. Stamerro*, 889 A.2d 1251, 1259 (Pa. Super. Ct. 2005); *Palmieri v. Partridge*, 853 A.2d 1076, 1079 (Pa. Super. Ct. 2004); *Conomos*, 831

17

A.2d 696; *Kaplan v. Cablevision of Pa., Inc.*, 671 A.2d 716, 721-22 (Pa. Super. Ct. 1996).[7]

The duty to act in good faith " varies somewhat with the context . . . , but it is possible to recognize certain strains of bad faith which include: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." *Somers v. Somers*, 613 A.2d 1211, 1213 (Pa. Super. Ct. 1992) (citation omitted). The duty of good faith applies "only in limited circumstances" because "[i]mplied duties cannot trump the express provisions in the contract."[8]

---

[7] Pennsylvania's intermediate appellate courts also recognize the conceptually similar common law doctrine of necessary implication, under which the "'law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made and to refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract.'" *Conomos*, 831 A.2d at 706 (quoting *Daniel B. Van Campen Corp. v. Bldg. & Constr. Trades Council*, 195 A.2d 134, 136-37 (Pa. Super. Ct. 1963)); *see also Palmieri v. Partridge*, 853 A.2d 1076, 1079 (Pa. Super. Ct. 2004).

[8] Lovejoy argues that "a plaintiff can only assert a claim for breach of the implied covenant of good faith and fair dealing by establishing that the defendant breached a 'specific duty imposed by the contract *other than the covenant of good faith and fair dealing*.'" Def.'s Br. at 11 (quoting *Benchmark Group, Inc. v. Penn Tank Lines, Inc.*, 612 F. Supp. 2d 562, 584 (E.D. Pa. 2009) (emphasis in *Benchmark Group*)). The phrase quoted from *Benchmark Group* originated in *Sheinman Provisions, Inc. v. Nat'l Deli, LLC*, which in turn derived this broad proposition from the fact that Pennsylvania does not recognize an independent cause of action for a breach of the covenant of good faith. *See* 2008 WL 2758029, at *3 (E.D. Pa. 2008) (citing *Burland v. ManorCare Health Servs., Inc.*, 1999 WL 58580, at *4 (E.D. Pa. 1999)). This court finds that the statement in *Sheinman* was not supported by the precedent upon which it purported to rely. The reason why *Burland* stated that a breach of the covenant of good faith is not an

*Conomos*, 831 A.2d at 706. Courts imply good faith duties in order "to harmonize the reasonable expectations of the parties with the intent of the contractors and the terms in their contract." *Id.* at 707. The purpose of these implied covenants "is to prohibit a party from 'taking advantage of gaps in a contract in order to exploit the vulnerabilities that arise when contractual performance is sequential rather than simultaneous.'" *Curley v. Allstate Ins. Co.*, 289 F. Supp. 2d 614 (E.D. Pa. 2003) (quoting *Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.,* 970 F.2d 273, 280 (7th Cir.1992) (Posner, J.)).

While there may be some marginal uncertainty regarding whether the Pennsylvania Supreme Court would adopt Section 205 of the Second Restatement, there is no question that Pennsylvania courts follow other well-settled principles of contract construction. The "'fundamental rule in contract interpretation is to ascertain the intent of the contracting parties.'" *Lesko v. Frankford Hospital Bucks-County*, --- A.3d ---, 2011 WL 149843, *4 (Pa. 2011) (quoting *Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 468

---

independent cause of action was simply to clarify that "a breach of such covenant is a breach of contract action." 1999 WL 58580, at *4. In other words, under *Burland*, a plaintiff pursuing an implied duty theory must bring a breach of contract action, not an independent cause of action for breach of the covenant of good faith and fair dealing. *Burland* did not purport to impose a requirement that a plaintiff asserting a claim for breach of the implied covenant of good faith demonstrate that the contract imposed a "specific duty . . . other than the covenant of good faith and fair dealing." *Sheinman Provisions*, 2008 WL 2758029, at *3. There appears to be no precedent for this requirement in any decision issued by a Pennsylvania state court, and this court therefore rejects Lovejoy's invitation to rely on *Benchmark Group*.

(Pa.2006)); *see also Crawford Cent. Sch. Dist. v. Commonwealth*, 888 A.2d 616, 623 (Pa. 1982).  In determining intent, "all provisions in the agreement will be construed together and each will be given effect.  [Pennsylvania courts] will not interpret one provision of a contract in a manner which results in another portion being annulled." *LJL Transp., Inc. v. Pilot Air Freight Corp.*, 962 A.2d 639, 647-48 (Pa. 2009) (citations omitted).

When a contract's terms are "clear and unambiguous, the intent of the parties is to be ascertained from the document itself." *Ins. Adjustment Bureau*, 905 A.2d at 468 (citation omitted).  However, when "an ambiguity exists, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is patent, created by the language of the instrument, or latent, created by extrinsic or collateral circumstances." *Id.* (citations omitted).  In addition, "'[w]herever reasonable, the manifestations of intention of the parties to a promise or agreement are interpreted as consistent with each other and with any relevant course of performance, course of dealing, or usage of trade.'" *Sunbeam Corp. v. Liberty Mut. Ins. Co.*, 781 A.2d 1189, 1193 (Pa. 2001) (quoting Restatement (Second) of Contracts § 202(5)).

With these principles in mind, this court turns to Kamco's claim that Lovejoy breached the implied covenant of good faith in its performance of the Agreement by classifying all but three of Kamco's accounts as House Accounts.  As noted above, the Agreement states that:

No commissions will be paid on House Account sales. *The Company reserves the right to redefine these accounts.* Addendum A attached shows a current roster of the aforementioned accounts in your territory.

Complaint at Ex. 1 ¶ 7(c) (emphasis added). In its summary judgment motion, Lovejoy argues that the House Account provision grants it an "*unfettered* right to redefine the House Accounts." Def.'s Br. at 8 (emphasis added). In defense of this interpretation, Lovejoy notes that the "word 'current' identifies the then-current House Accounts listed on Addendum A and signifies that the list of House Accounts could change in the future." Therefore, according to Lovejoy, "redefining the House Accounts does not constitute a breach of the Agreement." *Id.*

As an initial matter, it should be noted that the House Accounts provision does not contain any express statement that Lovejoy has the right to redefine *all* accounts as House Accounts. Rather, it makes the more ambiguous statement that Kamco had the exclusive right to sell Lovejoy products in its territory, with the "*exception*[]" that "[n]o commissions will be paid on House Account sales" and "[t]he Company reserves the right to redefine these accounts." Agreement ¶ 7(c) (emphasis added). Because the House Accounts are described as an "exception" to Kamco's general right to sell Lovejoy products, there is reason, even when looking at the House Accounts provision in isolation, to question whether it confers upon Lovejoy an "unfettered" right to redefine all accounts as House Accounts.

The more significant problem with Lovejoy's argument that it had an "unfettered" right to redefine the House Accounts is that this interpretation would nullify portions of the Agreement's termination provision. Pl.'s Opp. Br. at 17. Under the termination provision, the Agreement became effective January 1, 2004, and:

> shall continue in force for a one (1) year period, and shall be automatically renewed for additional one (1) year periods thereafter unless terminated by written notice from either party to the other party not less than sixty (60) days prior to the end of the initial or any subsequent one (1) year term.

Agreement ¶ 16. The Agreement also provides for termination by either party under certain additional circumstances, including (1) a change of 50% or more of the ownership of the other party; (2) the other party's unreasonable and repeated failure to perform the terms and conditions of the Agreement; or (3) the other party's filing of a bankruptcy petition. *Id.* Finally, the Agreement expressly contemplates that the parties could terminate the Agreement at any time by "mutual written agreement." *Id.*

The termination provision, on its face, provides a comprehensive account of the ways in which the Agreement may be terminated. There is no indication in the Agreement that the parties contemplated that the House Accounts provision would constitute an additional means for terminating all of Lovejoy's obligations under the Agreement. Under Lovejoy's construction of the House Accounts provision, however, Lovejoy could, at any time and without Kamco's consent, redefine every single account in Kamco's territory as a House Account. This interpretation would allow Lovejoy to escape from all of its obligations under the Agreement and all of the restrictions in the

22

termination provision.

This reading is inconsistent with Pennsylvania law, which, as noted above, forbids courts from "interpret[ing] one provision of a contract in a manner which results in another portion being annulled*," LJL Transp.,* 962 A.2d at 648 (citation omitted), and requires that "[t]he whole instrument . . . be taken together in arriving at contractual intent," *Duquesne Univ.*, 777 A.2d at 429 (citation omitted). For example, the termination provision permits the parties to terminate the agreement at any time by "mutual written agreement." Agreement ¶ 16. Lovejoy's interpretation of the House Accounts provision, however, would allow it—without obtaining Kamco's consent—to terminate all of its obligations under the Agreement at any time simply by redefining all of Kamco's accounts as House Accounts. In other words, the "mutual" termination provision would never apply to Lovejoy.

Similarly, Lovejoy's reading of the House Accounts provision would allow it to escape the effects of the 60 day notice requirement, under which the Agreement automatically renews for a full year unless either party provides notice of its intention to terminate the Agreement 60 days before the end of an annual term. *Id.* The evident purpose of this provision is to permit both parties to make business plans in reliance on the contract's continued existence for a one year period.[9] This purpose would obviously

———————————

[9] This provision distinguishes this case from *H. L. Miller Machine Tools v. Davenport Machine*, 1998 WL 341828 (N.D. Ill. 1998), which involved a similar contractual provision allowing a manufacturer to redefine its sales agent's accounts as

be frustrated if one party maintained a unilateral right to opt out of all of its obligations under the contract at any time—which is precisely how Lovejoy construes the House Accounts provision.[10]

This court's conclusion that Lovejoy's reading of the House Accounts provision is inconsistent with the parties' intent is reinforced by the fact that the Agreement contains a non-compete provision. The noncompetition provision states that Kamco could not, without Lovejoy's permission, sell any product which is directly competitive with any Lovejoy product that Kamco was supposed to sell on Lovejoy's behalf. *Id.* ¶ 2. If, as Lovejoy suggests, the House Accounts provision granted Lovejoy the "unfettered" right to redefine all or substantially all accounts as House Accounts, then Lovejoy would have the unilateral power to deprive Kamco of all of the benefits it was to receive under the contract while simultaneously barring Kamco from selling any product made by a

---

house accounts. In *H.L. Miller*, the contract did not automatically renew for an additional one year term, but instead could be freely terminated by either party, without cause and at any time, by providing sixty days notice. *Id.* at *2. The court's decision emphasized that this termination provision protected the sales agent, who could, if he were "dissatisfied with a new designation of a 'house account,' . . . simply cease working as a distributor for Davenport." *Id.* at *4. Kamco, by contrast, lacked similar flexibility because it was bound for up to a full year to a contract containing a noncompetition clause.

[10] Lovejoy suggests that Kamco's argument that Lovejoy's reading of the House Accounts provision rendered the termination provision meaningless is a "*non sequitor* because, as set forth herein, Lovejoy had the unfettered right to redefine the House Accounts." Def.'s Reply Br. at 3 n.1. Lovejoy's logic is circular: Lovejoy assumes that it had an "unfettered" right to redefine all of the accounts as House Accounts, and then uses that assumption as a basis for rejecting Kamco's argument that an "unfettered" right to redefine the House Accounts is inconsistent with the termination provisions.

Lovejoy competitor. Such a result would plainly seem to be contrary to Kamco's "reasonable expectations" when it entered the Agreement. *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 617 (3d Cir. 1995).

The inconsistency between the termination provision and the House Accounts provision disappears if the House Accounts provision is read to contain an implied covenant of good faith governing Lovejoy's exercise of discretion in its designation of House Accounts. Good faith duties are implied "where it is clear that an obligation is within the contemplation of the parties at the time of contracting or is necessary to carry out their intentions." *Slater v. Pearle Vision Center, Inc.*, 546 A.2d 676, 679 (Pa. Super. Ct. 1988); *see also Duquesne Light*, 66 F.3d at 617 (noting that "courts generally utilize the good faith duty as an interpretive tool to determine the parties' justifiable expectations"). This court finds that, reading the Agreement as a whole, Kamco possessed a justifiable expectation that, at a minimum, Lovejoy would not use its discretion under the House Accounts provision to deprive Kamco of its benefits under the Agreement by redefining all or substantially all of Kamco's accounts as House Accounts.[11] Reading the House Accounts provision in this manner allows the termination

---

[11] Of course, as Lovejoy repeatedly notes, *see* Pl.'s Br. at 10, "[i]mplied duties cannot trump the express provisions in the contract." *Conomos*, 831 A.2d at 706. However, as noted above, the House Accounts provision does not contain any express statement that Lovejoy has the right to redefine all or substantially all accounts as House Accounts, and such a reading of the House Accounts provision would render portions of the termination provision meaningless. Moreover, to the extent that the contract is ambiguous, the court notes that the parties' prior course of dealing contained no precedent

provision to have its intended effect: If one of the parties wishes to put an end to its obligations to the other party, it must follow one of the enumerated ways of terminating the Agreement.

Turning to the facts of this case, it is undisputed that Lovejoy internally contemplated terminating the Agreement in the fall of 2008 but opted to allow it to automatically renew for an additional full year term. It is also undisputed that, in January 2009, after Kamco declined to agree to a mutual termination of the Agreement, David Mortensen, one of defendant Lovejoy's employees, wrote an internal email stating that Lovejoy's "goal [was] to transfer all of [Kamco's accounts] to house accounts," with the result that Kamco would receive "no commissions because all the accounts will be house accounts." Thereafter, Lovejoy redefined all but three of Kamco's accounts to be House Accounts. Pl.'s Ex. 10. Under these circumstances, genuine issues of fact remain regarding whether Lovejoy's conduct regarding the House Accounts violated the duty of good faith and fair dealing.[12]

---

for Lovejoy's decision to redefine nearly all of Kamco's accounts as House Accounts. Instead, as described above, Lovejoy had previously redefined an account only three times prior to 2009, and on each occasion modified the status of only a single account. In 2009, by contrast, Lovejoy expanded the list of House Accounts from six accounts to 125 accounts, leaving only three accounts to be serviced by Kamco.

[12] As a fallback position, Lovejoy argues that "it is undisputed that there was no bad faith" in its behavior in this case because Lovejoy "displayed honesty in fact" by explaining to Kamco that Lovejoy "needed to cut costs to survive the economic recession." Def.'s Reply at 8 n.3. However, "fair dealing may require more than honesty," and bad faith includes "evasion of the spirit of the bargain." Restatement (Second) of Contracts § 205 cmt. d; *see also Somers*, 613 A.2d at 1213. In this case,

It should be noted, however, that Count I of Kamco's complaint alleges that Lovejoy committed breach of contract not only by violating the covenant of good faith and fair dealing but also by "constructively terminating" the agreement. In its summary judgment motion, defendant Lovejoy argues that Pennsylvania courts have not recognized constructive termination claims outside of the contexts of employment law and franchise agreements. *See* Def.'s Br. at 12. Kamco's opposition brief does not respond to this argument, or make any attempt to defend Kamco's constructive termination theory. Instead, Kamco's defense of its breach of contract claim focuses exclusively on whether Lovejoy violated the covenant of good faith and fair dealing. *See* Pl.'s Opp. Br. at 13-22. This court therefore finds that Kamco has waived its constructive termination claim. *See Ray v. Pinnacle Health Hosps., Inc.*, 2010 WL 4704455, at *4 (3d Cir. 2010) ("'If a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived . . . .'" (quoting *Grenier v. Cyanamid Plastics, Inc.*, 70 F.3d 667, 678 (1st Cir.1995))).

Accordingly, Lovejoy's request for summary judgment on Kamco's breach of contract claim will be denied with respect to Kamco's theory that Lovejoy committed a breach of the covenant of good faith, but granted with respect to Kamco's constructive termination theory.

---

there is more than a "mere scintilla" of evidence, *Anderson*, 477 U.S. at 249, supporting the conclusion that Lovejoy attempted to deprive Kamco of substantially all of the benefits to which it was entitled under the Agreement, in violation of the duty of good faith and fair dealing.

**D. Pennsylvania Commissioned Sales Representative Act**

Kamco alleges that Lovejoy violated the PCSRA by willfully failing to pay commissions that Kamco would have been paid had Lovejoy not redefined the House Accounts. Lovejoy argues that it is entitled to summary judgment because plaintiff is not a "sales representative" under the PCSRA, which requires that sales representatives sell to "retailers." Because Kamco has failed to present evidence that it is, in fact, a "sales representive" as that term is used in the PCSRA, I will grant summary judgment to Lovejoy on the PCSRA claim.[13]

The PCSRA provides that a "principal shall pay a sales representative all commissions due at the time of termination within 14 days after termination" and "all commissions that become due after termination within 14 days of the date such commissions become due." 43 Pa. Cons. Stat. §§ 1473-74. If a principal "willfully" violates these provisions, then the sales representative may bring a civil action to collect all unpaid commissions plus exemplary damages and attorneys' fees. *Id.* § 1475. The Act thus governs the payment of commissions owed by a "principal" to a "sales representative," and a defendant can only be liable if the plaintiff is a "sales representative" as that term is used in the Act. *See Total Control, Inc. v. Danaher Corp.,*

---

[13] Lovejoy also argues that, even assuming that Kamco is a sales representative under the PCSRA, Lovejoy did not "willfully" violate the Act. *See* Def.'s Br. at 16 (citing 43 Pa. Cons. Stat. § 1475). Because Kamco is not a sales representative for purposes of the PCSRA—a threshold requirement for entitlement to relief under that statute—this opinion will not address whether Kamco "willfully" violated the Act.

No. 02-668, 2004 WL 1878238, at *2 (E.D. Pa. Aug. 18, 2004) ("Under § 1475 of the

PCSRA, liability is only triggered if a 'principal' fails to pay a 'sales representative.'").

The PCSRA defines the term "sales representative" as follows:

> "Sales representative." A person who contracts with a principal to solicit
> wholesale orders from *retailers* rather than consumers and who is
> compensated, in whole or in part, by commission. The term does not
> include one who places orders or purchases for his own account for resale
> or one who is an employee of a principal.

*Id.* § 1471 (emphasis added). Thus, a "sales representative" is someone who solicits

wholesale orders from "retailers" rather than "consumers."

The parties agree that Lovejoy sells its goods to two types of customers: original

equipment manufacturers ("OEMs") and industrial distributors. OEMs purchase

Lovejoy's products for the purpose of incorporating them into another product, which

will then be sold. Industrial distributors, by contrast, purchase Lovejoy's products in

order to resell them. The parties disagree about whether these two types of customers are

"retailers." In Kamco's view, "a 'consumer' buys a product with no intention of selling it

again. But, a retailer buys for the purpose of reselling the article." Pl.'s Opp. Br. at 24.

Since both OEMs and industrial distributors have no intention of keeping Lovejoy's

products for their own use, Kamco argues that both OEMs and industrial distributors are

retailers under the PCSRA. Lovejoy, however, argues that OEMs are not retailers

because the term "retailers" does not encompass manufacturers making use of component

parts. Def.'s Br. at 15. Lovejoy also argues that Kamco has failed to present evidence

29

that the industrial distributors are retailers who sell to "consumers" (as opposed to other types of buyers, such as OEMs).  Def.'s Reply Br. at 11-12.

Kamco's PCSRA claim thus hinges on the meaning of "retailers"—a term that the PCSRA does not define.  When non-technical words are undefined in a statute, they are construed according to "their common and approved usage."  1 Pa. Cons. Stat. § 1903(a).  Two courts in this district have previously addressed how to construe the term "retailers" in the PCSRA.  In the first case, *United Products Corp. v. Admiral Tool and Manufacturing Co.*, the court surveyed various dictionary and statutory definitions of "retailer":

> The term "retailer" is defined as "[a] person engaged in making sales to ultimate consumers. One who[] sells personal or household goods for use or consumption." *Black's Law Dictionary* 1315-16 (6th ed.1990); *see also id.* at 1315 (defining "retail," *v*, as "to sell by small quantities, in broken lots or parcels, not in bulk, directly to consumer."); *Webster's II New Riverside University Dictionary* 1003 (1994) (defining "retail," *n*, as "the sale of goods in small quantities to consumers."); Unfair Sales Act, 73 P.S. § 212(4) (defining "retail sale" as "any transfer for a valuable consideration . . . of title to merchandise to the purchaser for consumption or use other than resale or further processing or manufacturing").

122 F. Supp. 2d 560, 564 (E.D. Pa. 2000).  Summing up these definitions, the court concluded that "the plain and ordinary meaning of a retailer is one who is selling some tangible good or  product to an ultimate consumer."  *Id.*  Accordingly, the court rejected the plaintiff's argument that the term retailer "encompass[es] transit agencies, rail car builders, or transit authorities."  *Id.*

The second PCSRA decision from this court, *Total Control, Inc. v. Danaher Corp.*,

No. 02-668, 2004 WL 1878238, *3 (E.D. Pa. 2004), observed that a then-recent

Pennsylvania Supreme Court decision had construed the term "ultimate consumer" in a

different statute as follows:

> "[U]ltimate" refers to a point "beyond which it is impossible to go; farthest;
> most remote or distant" or "by which a process or series comes to an end;
> final; conclusive." *Webster's New World College Dictionary* 1551 (4th ed.
> 1999). "Consumer" is "[a] person who buys goods or services for personal,
> family, or household use, with no intention of resale; a natural person who uses
> products for personal rather than business purposes." *Black's Law Dictionary*
> 311 (7th ed. 1999); *see also Webster's New World College Dictionary* 313 (4th
> ed. 1999) (a "consumer" is "a person or thing that consumes; specif., a person
> who buys goods or services for personal needs and not for resale or *to use in
> the production of other goods for resale*") (emphasis added) . . . .

*AMP Inc. v. Pennsylvania*, 852 A.2d 1161, 1166 n.4 (Pa. 2004). Noting that its analysis

of the PCSRA was "informed" by the *AMP* decision, the *Total Control* court concluded

"that the phrase 'ultimate consumer' refers to retail customers and does not include

manufacturers making use of component products." 2004 WL 1878238, *3 (citing *AMP*,

852 A.2d 1161).[14]

This court finds the analysis of the PCSRA in *United Products* and *Total Control*

persuasive and in conformity with common usage. Under the PCSRA, a retailer sells a

---

[14] It should be noted that the term "ultimate consumer" is not in the text of the
PCSRA. *United Products* and *Total Control* focused on it because a retailer is
conventionally understood to sell to "ultimate consumers." *See United Prods.*, 122 F.
Supp. 2d at 564 ("The term 'retailer' is defined as '[a] person engaged in making sales to
*ultimate consumers*. One who[] sells personal or household goods for use or
consumption.'" (quoting *Black's Law Dictionary* 1315-16 (6th ed.1990) (emphasis
added))).

tangible product to an ultimate consumer. An ultimate consumer, in turn, (1) buys goods for personal, family, or household use, without any intention to (2) resell the goods or (3) use those goods in the manufacture of other goods for sale.

Kamco asserts that the interpretation of the PCSRA presented in *Total Control* and adopted here is unreasonable and leads to absurd results because it "has the practical result of a large segment of commissioned sales representatives being excluded from protection for no logical reason." Pl.'s Resp. to Def.'s Mot. for Summ. Judg. at 25; *cf.* 1 Pa. Cons. Stat. § 1922(1) ("[T]he General Assembly does not intend a result that is absurd, impossible of execution or unreasonable."). This court does not find the results here so unreasonable or absurd as to justify departing from the common meaning of the term "retailer." It is undisputed that the PCSRA does not aspire to provide protection to all sales agents who work on commission. For example, the PCSRA excludes from its protection commissioned sales made directly to consumers (as opposed to retailers). *See* 43 Pa. Cons. Stat. § 1471 (defining a "sales representative" as a "person who contracts with a principal to solicit wholesale orders from *retailers rather than consumers*" (emphasis added)).

In addition, the Pennsylvania General Assembly's choice of the word "retailer" appears to have been quite deliberate. As the court in *Total Control* noted, as of 2004:

> At least 28 states have a statute similar to the PCSRA. Of those 28 states, only two, Pennsylvania and Arizona, use the word "retailer" in its definition of sales representative. From this it is clear that the term "retailer" is not merely a matter of semantics but instead serves an important and intentional limitation

on whom the Pennsylvania legislature intended to protect under PCSRA.

2004 WL 1878238, *2 (citations omitted). While this court's inquiry into the legislative history of the PCSRA has not uncovered any definitive explanation for the legislature's decision to use the term "retailer," it is not absurd to think that the General Assembly may have intended to limit the Act to certain types of commissioned sales thought to be most in need of legislative protection—namely, sales made to retailers.

Applying the definitions of retailers and ultimate consumers adopted above, it is evident that Kamco is not a sales representative within the meaning of the PCSRA. By all accounts, the OEMs purchase Lovejoy's products in order to incorporate them into other products. Thus, they are not "retailers" as that term is used in common speech. With respect to the industrial distributors, Kamco argues that they "bought from [Lovejoy] for the sole purpose of selling the product again to someone else." Pl.'s Resp. to Def.'s Mot. for Summ. Judg. at 25. This is not enough to establish that the distributors are retailers who sell to ultimate consumers. As Lovejoy points out, Ken Morrison of Kamco testified at his deposition that one industrial distributor sells Lovejoy's products to manufacturers rather than ultimate consumers. See Def.'s Ex. C. at 101:19-20 ("They sell [Lovejoy's products] to people who build equipment."). While Morrison also testified that the same distributor also made sales "to people who make food" and to "anybody that's got two shafts that they need to put together," id. at 101:20-23, this court finds that Kamco has failed to present adequate evidence that the industrial distributors do, in fact, make sales

to ultimate consumers.  Much like the plaintiff in *Total Control*, Kamco has presented

only "conclusory statements" from Morrison and has "not identified the customers of

the[] distributors."  2004 WL 1878238, *3.  Accordingly, Kamco has failed to present

"more than a mere scintilla of evidence" in support of a crucial element of its PCSRA

claim, *Anderson*,  477 U.S. at 249, and this court will grant summary judgment to

Lovejoy on the PCSRA claim.

## IV.  CONCLUSION

For the foregoing reasons, Lovejoy's motion for summary judgment will be

granted with respect to Kamco's PCSRA claim and its constructive termination theory of

breach of contract, but denied with respect to Kamco's claim that Lovejoy committed

breach of contract by violating the implied covenant of good faith and fair dealing.  An

appropriate order accompanies this opinion.

BY THE COURT:


  LHP                        
Pollak, J.